## J. P. MULLINAX v. WESTERN UNION TELEGRAPH COMPANY.

(Filed 9 November, 1911.)

1. Telegraphs—Death Message—Error in Transmission—Delivery— Negligence—Evidence—Nonsuit—Instructions.

Evidence tending to show that while attempting to deliver a message announcing a death the agent of a telegraph company was informed where the addressee could be found, and made no personal effort to deliver it there, but intrusted the communication to another who was not in the defendant's employment, and that had the message been correctly transmitted and delivered as sent the addressee could and would have attended the funeral, is sufficient upon the issue of defendant's negligence, and a motion to nonsuit or instructions directing a verdict for defendant on the evidence should be refused.

2. Telegraphs—Contributory Negligence—Information—Evidence.

In an action to recover damages from a telegraph company for mental anguish caused by the defendant's negligence in failing to correctly transmit and properly deliver a message announcing a death, thereby causing his absence from the burial of the deceased, the plaintiff must show more than mere negligence on defendant's part, for if it appears that he received information of the death from some other source in time to attend the funeral, and under such circumstances that he could have gone and failed to go, he would be guilty of contributory negligence, the proximate cause of the injury, which would bar his recovery.

3. Telegraphs—Negligence—Telegrams—Principal and Agent—Information—Damages.

A telegraph company cannot escape liability for damages when it intrusts to another the delivery of information to the addressee of a message announcing a death, which by reasonable efforts it should have delivered in time to have avoided the consequences.

4. Same—Rule of the Prudent Man—Burden of Proof.

It is the duty of an addressee who has received partial information from another concerning a message wherein his name was erroneously transmitted, announcing the death of one "Jennie Rans," which should have been "Jennie Rains," not to be negligent himself; and the burden is upon him to show that he acted as a reasonably prudent man would have done under all the circumstances in making inquiry from the defendant's agent or otherwise, or that he had not been put upon such reasonable inquiry as should have caused him to go to the funeral, and thus avoid the damages sought.

**5. Same—Negligence.**

A telegram addressed to "J. H. Mullinax," announcing the death of "Jennie Rains," was erroneously transmitted to "J. H. Mullins," announcing the death of "Jennie Rans." The defendant telegraph company introduced evidence tending to show reasonable efforts to deliver it, and subsequently that its agent received information from a certain person that the plaintiff could be found at a certain place, and such person took a memorandum of the substance of the message and communicated it to the plaintiff and his wife. There. was conflicting evidence as to whether the plaintiff knew himself to be the addressee or that the deceased was a sister of his; and if the sending point of the message had been communicated to him the night before he would have known that the deceased was his sister. There was evidence tending to show that if the message had been correctly communicated to him promptly that night he could have made necessary financial arrangements in time to have taken a train to his destination and reached there for the funeral: *Held*, the burden was upon the defendant to show, on the question of contributory negligence, that the plaintiff could have gone to the funeral of the deceased had he acted within the rule of the prudent man.

**6. Telegraphs—Contributory Negligence—Death Message—Postpone Funeral.**

In an action for the recovery of damages for mental anguish alleged by plaintiff as caused by defendant's negligence in not properly transmitting and sooner delivering a telegram relating to a death, the burden is upon the defendant to show, if the defense is relied on, that the damages could have been avoided by the postponement of the funeral, and the plaintiff cannot be chargeable for the failure to postpone it by one over whom he had no control, in this case the husband of plaintiff's deceased sister.

APPEAL from *Daniels, J.,* at May Term, 1911, of ORANGE.

This is an action to recover damages for mental anguish, caused, as the plaintiff alleges, by the negligence of the defendant in the delivery of a telegram, notifying him of the death of his sister, Jennie Rains, which prevented him from attending her funeral.

Jennie Rains lived at Franklinsville, in Randolph County. It was admitted that on 28 February, 1910, about 3 o'clock P. M., the following telegram was delivered to the agent of the defendant at Franklinsville:

MULLINAX *v.* TELEGRAPH CO.

*To* J. P. MULLINAX, *care Eno Cotton Mills, Hillsboro, N. C.:*

Jennie Rains killed this morning by a cow.    Funeral to-morrow evening.    Answer.                    T. A. SLACK.

And that when received by the agent of the defendant at Hillsboro, at 3:35 P. M. of the same day, it read as follows:

*To* J. H. MULLINS, *care E. C. M. H. B.:*

Jennie Rans killed this morning by a cow.    Funeral to-morrow evening.    Answer.                    E. A. SLACK.

It was also admitted that the sister of the plaintiff was buried about 2 o'clock P. M. on 29 February, 1910, and that the plaintiff could have reached Franklinsville in time for the funeral on a train leaving Hillsboro at 5 o'clock P. M. of 28 February, and on one leaving the same place at 4 o'clock A. M. of 29 February.

The telegram was delivered to the plaintiff in the form in which it was received at Hillsboro, about 8 A. M. of 29 February, and the plaintiff immediately telegraphed that he would be at Franklinsville on the next train, which telegram was received before the funeral.

It was also admitted that the plaintiff went to Franklinsville on the next train after the telegram was delivered to him, and reached there about 5 o'clock P. M. of 29 February, after his sister was buried.

The plaintiff introduced evidence tending to prove that he had been the engineer at the Eno Mills for seven years and was well known; that he worked within 500 or 600 yards of the office of the defendant, and that if the telegram had been promptly delivered, as it was when received by the defendant, he could and would have gone to Franklinsville in time for the funeral.

There was evidence on the part of the defendant that the telegram was promptly sent out by its messenger boy, and that he made inquiry for J. H. Mullin, and could not find such a person.

J. M. O'Neill, a witness for the defendant, testified that he was the manager of the defendant at Hillsboro, and that

W. E. Haynes was its operator; that on the night of 28 February he had a conversation with Mr. H. S. Cates; that Mr. Cates, Haynes, and himself were at supper, and Haynes remarked to the witness that the boy had not delivered this death message; could not find the party, J. H. Mullin; that Mr. Cates spoke up and wanted to know who was dead, and Haynes then repeated the message to him; that Mr. Cates said: "Maybe that is Jess Mullinax," and said, "I am going right on back to the store, and he lives close to the store, and if it is some of his people, I will notify him"; that Mr. Cates took an envelope, as witness remembers, out of his pocket, and copied down what Mr. Haynes told him was in the message from Franklinsville, and that Jennie Rans had been killed by a cow and would be buried to-morrow afternoon; was not sure whether he told him who it was signed by or not; that Mr. Cates copied that down on an envelope he took out of his pocket; that it was in the afternoon; they were at supper, and that time of the year they had supper about 6 o'clock; that they were at Miss Bettie Conklin's boarding-house near the depot; that he was in the telegraph office that night; that he was in there nearly every night on an average until about 11 o'clock; that he had two lamps burning; the doors were not open, but anybody could get in that wanted to; Mr. Mullinax did not come to the office that night; witness was present when he came there the next morning; he came in and Mr. Haynes was at the telegraph table and witness was at the other side of the office, and Mullinax asked if there was a message for him, and Mr. Haynes told him there was one for J. H. Mullin, which might be intended for him, and gave it to him; Mullinax read it and signed for it; the message was addressed to J. H. Mullin; that when the message was delivered to Mullinax he sent a message to Mr. T. A. Slack; that this message was delivered to Mr. Haynes; Mullinax left on the train at 10:25 or 10:28.

H. S. Cates, who was a merchant in Franklinsville, witness for the defendant, testified: "I live just south of the Occoneechee Mountain, about a mile and a half from the depot, and am not connected in any way with the Western Union Tele-

graph Company, and have no interest in the result of this litigation. When I went to supper just beyond the station, when I went into the dining-room at Miss Bettie Conklin's, Mr. O'Neill was sitting at the table, and he and Mr. Haynes were discussing about a message, and Mr. O'Neill asked me if I knew a party by the name of J. H. Mullins on the hill, and I told him I did not, but I did know a party by the name of J. P. Mullinax, who lived near my store, and I asked him about the message, and he told me about it, and I said I rather expected it was for Mr. Mullinax, and I said: 'If you will give me a copy of it, or give me the message, I will carry it there,' and Mr. Haynes gave me a copy. I took a right copy—don't know that I copied it exactly, but I 'took the outline. I don't know that I got a statement that the funeral would be the next evening, but I got a statement that Jennie Rans was dead. I got the statement that it was from Franklinsville, sent by some Mr. Slack. After I ate supper, I went back to the store, and I sent some party, I don't remember who, to see Mr. Mullinax. He lived off the path a distance, and I sent a party by to tell Mr. Mullinax to come to the store, I wanted to see him; and in a few minutes Mr. Mullinax and his wife came in the store and I was out, and when I came in he told me he had been waiting about five or ten minutes, and he asked me what I wanted to see him about, and I told him I had a message, and had a copy of it in my pocket, and I began to look for it and could not find it at once, but afterwards I did find it and read the message to him. I read that a Mrs. Jennie Rans from Franklinsville was dead. I don't believe I stated when she would be buried. I told him she had been killed by a cow, and that Mr. Slack sent the message. I don't think I told him any initials. I told him that Mr. Slack had sent a message stating that Jennie Rans, of Franklinsville, had been killed by a cow. I don't think Mr. Mullinax said anything, but Mrs. Mullinax said: 'You have got some people up there, and I expect it is your sister;' and they remarked to each other one thing and another about it, and I think they finally decided it was his sister; but I told him the message was for J. H. Mul-

156—35

lins. His wife said in a few minutes, 'You will have to go, won't you?' and he said, 'Yes,' and she said, 'You had better get ready and go.' This was about 8 o'clock on the night of the 28th."

There was other evidence on the part of the defendant tending to corroborate this evidence.

The plaintiff was examined as a witness, and among other things, said: That he was fond of his sister, as much so as any brother could be of a sister; that it had been something like a year and a half or two years prior to her death that he had seen her; she lived at the same place she did when she died, when he last saw her; that he has suffered mental anguish and regretted the failure to see her before she was put away; that it had given him a lot of trouble; that he has been running an engine at the Eno Cotton Mills; he has had the same job ever since he has been there; that his reason for going to the telegraph office on the morning of 1 March and making inquiry about a telegram, was that the night before Mr. Scott Cates sent for him to come up to his store, about 8 o'clock; he went there, and it was some time after he got there before he saw Mr. Cates—some twenty or twenty-five minutes; finally Mr. Cates came in and said Mr. O'Neill, the agent, told him there came a telegram for somebody saying his sister was killed; it sounded like Jennie Rans or Jennie Renn, or something like that; Mr. Cates had written it down, but he had lost the paper; Mr. Cates said Jennie Rans or Jennie Renn, or something like that, and a name sounding like J. H. Mullin; it was not his name, but sounded something like him, and it might be for him; that he did not think much about it at the time and went on home; the next morning he got to thinking about it, and went to the depot; that he went to the depot after he had gone to work; that he went to the office as soon as it was opened; the mill opens at 6 o'clock, which was before the opening of the telegraph office; the telegraph office was not open at the time Mr. Cates spoke to him; that they did not have any night train and had closed up; that he did not know where Mr. O'Neill lived; that if the telegram had been delivered on the evening of 28 February he would have gone right away to Franklins-

MULLINAX *v.* TELEGRAPH CO.

ville to his sister's funeral, on the first train he could have got, if he had been sure about it; that he is pretty sure he could have arranged with the mill between 3:25 and 5:28 to have gotten off; that in a case of that kind he certainly could have gone.

Cross-examination:

That on the night of 28 February he went to Mr. Cates' store in response to a message from Mr. Cates, sending for him; he did not know what Mr. Cates wanted; that his wife went with him; that they went into the store together.

Q. When you went in there, didn't Mr. Cates tell you that he had had a talk with Mr. Haynes and Mr. O'Neill? A. No, sir.

Q. Didn't he tell you that the telegraph company had gotten a message saying that Jennie Rains, who lived at Franklinsville, had gotten killed, and it was addressed to some one named J. H. Mullin, and he thought it might be for you? A. No, sir; he didn't tell me that way.

Q. Didn't he say there was a message for J. H. Mullins, saying Jennie Rans or Jennie Rains had been killed, and sent from Franklinsville? A. He told me Mr. O'Neill had asked him to-see if there was anybody there by that name, and he thought it was so much like my name, it might be for me. He didn't say anything about Franklinsville.

Q. He told you the message stated Jennie Rains had been killed by a cow? A. Jennie Rans, he said.

Q. Had been killed by a cow and the funeral would be to-morrow? A. Yes, sir.

Q. Didn't he tell you that the message was from Franklinsville? A. If he did, I don't remember it. If he had said anything about Franklinsville, I would have been more sure of it.

Q. Didn't your wife turn to you and say, "Jim, that is your sister, and you had better get ready to go?" A. No, sir, not that I know of.

Q. After you had this conversation with Mr. Cates, you never went down to the telegraph office? A. No, sir; not that night.

Q. You went home? A. Yes, sir.

That the next morning about 8 o'clock he went to the telegraph office and got the message, and at 8:10 he sent a telegram.

Q. You went down and asked them to see this message addressed to J. H. Mullin? A. Yes, sir; and I saw it was from Franklinsville and I was pretty sure it was my sister.

Q. Then you telegraphed to T. A. Slack that you would be there on the next train? A. Yes, sir.

Q. If you had left there at 4 o'clock in the morning you would have got to Franklinsville exactly the same time as if you had left at 5:38 in the afternoon? A. Yes, sir; and I would have left if I had been sure it was my sister.

That after he telegraphed Mr. Slack, he went to Franklinsville; that after his talk with Mr. Cates he did not go to Miss Conklin's, where Mr. Haynes was boarding, to find out anything about the message; that he knew Mr. Haynes was working at the telegraph office; that he never went to where he was boarding and he never went to the station until the next morning.

Redirect examination:

He went to the mill after he got the message and saw Mr. Webb, who was secretary and treasurer, and arranged with him to get off; the mill closed at 6 o'clock; that he did not go to the depot on the night of 28 February; that he did not go to the depot that night because the depot was shut up and there was no use to go down there, "and I was not sure it interested me anyhow to go." That he did not know the depot was shut up; knew it was customary for it to be shut up; he did not go down to see whether it was shut up or not. That on the morning of 1 March he got the money to go to Franklinsville on; that he got it from Mr. Webb at the office; that he could not have gone without first getting money, and did not have the ready money that night; that the mill was not open that night and that he did get the money without any trouble at the mill in the daytime when he asked for it.

The wife of the plaintiff corroborated his evidence.

Exceptions were taken by the defendant to the refusal of its motion to nonsuit, the failure to give certain prayers for

instructions, and to parts of his Honor's charge, all of which are embraced in five propositions:

(1) That the information given to the plaintiff by the witness Cates was as full as that he acted on the next morning, and that he received it in time to leave Hillsboro at 4 o'clock A. M. of 29 February, and in time to reach Franklinsville before the funeral, and that, therefore, his failure to act on this information was negligence and the proximate cause of the injury.

(2) That this information, if not as full as that he received next morning, was sufficient to put the plaintiff on inquiry, and that he failed to make the inquiry, and was therefore negligent, and that this was the proximate cause of his injury.

(3) That predicated on the two preceding propositions, the plaintiff was guilty of contributory negligence on his own evidence.

(4) That if the funeral of the sister could have been reasonably postponed until the arrival of the plaintiff, and her husband declined to postpone it, the answer to the third issue should be "Nothing."

(5) That his Honor erred in charging that the burden of the second issue was on the defendant.

The jury returned the following verdict:

1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: Yes.

2. If so, did the plaintiff, by negligence on his part, contribute to said injury? Answer: No.

3. What damages, if any, is the plaintiff entitled to recover? Answer: $1,000.

From a judgment in accordance with the verdict, the defendant appealed.

*S. M. Gattis and Bryant & Brogden for plaintiff.*
*King & Kimball, George H. Fearons, and A. S. Barnard for defendant.*

ALLEN, J. The negligence of the defendant cannot be disputed. It failed in its duty in that it transmitted the message

incorrectly, and also in making no inquiry and no effort to deliver to the plaintiff, after being informed that it was probably intended for him.

It is, however, true, as the defendant contends, that negligence alone will not entitle the plaintiff to recover, and that he must go further and show that this negligence was the proximate cause of his injury.

It is also true that contributory negligence on the part of the plaintiff is fatal to his action, and that if he received information of the death of his sister from some other source, in time to attend the funeral, and under such circumstances that he could have gone, and failed to go, that he would be guilty of contributory negligence, and the negligence of the defendant would not be proximate.

There is practically no dispute as to the law. The controversy is as to the facts, and as to the meaning and effect to be given to the evidence.

If we construed the evidence of the plaintiff as the defendant does, or if we were permitted to dispose of the case on the evidence of the defendant alone, we might be justified in denying a recovery; but in our opinion his Honor held correctly that on the whole evidence the question of proximate cause and contributory negligence was for the jury, and this he submitted to them under proper instructions.

The plaintiff does not say that the witness Oates told him that there was a telegram for him saying his sister was dead, but that a telegram had come for some one with a name like J. H. Mullin, that Jennie Rans or Jennie Renn was dead. He denies that he was told that the telegram came from Franklinsville.

The conversation with Oates was at 8 or 9 o'clock at night, when the telegraph office was closed; he had no money and the mills were closed, where he could have gotten money.

According to the plaintiff, he received the additional information the next morning, that the telegram was from Franklinsville, and then concluded it was his sister.

If the telegram had been transmitted correctly and had been promptly delivered, the plaintiff would have received it before

4 o'clock P. M. of 28 February, when the mills were open, and he says he could have gotten the money for his expenses, and would have left Hillsboro on the 5 o'clock train, and if so, would have reached Franklinsville in time for the funeral.

The defendant cannot, under these circumstances, escape liability by imposing upon one, who owed no duty to the plaintiff, the obligation of conveying information which the plaintiff says was imperfect, and at night, when the plaintiff had no money and could not get it, and when the office of the defendant was closed.

We have considered the first three propositions, insisted on by the defendant, largely on the evidence of the plaintiff, because they are presented under a motion to nonsuit, and under prayers for instructions directing a verdict in favor of the defendant on the first and second issues, all of which should have been denied, if there was any aspect of the evidence upon which a verdict could have been returned in favor of the plaintiff.

His Honor imposed upon the plaintiff all that is required by law. He charged the jury that the burden was on the plaintiff to prove negligence, and that this negligence was the proximate cause of his injury, that is, that it prevented him from attending the funeral.

He also said, as to 'the duty of the plaintiff: "It was his duty to exercise the care of a man of ordinary prudence, notwithstanding the fact if the defendant had been negligent in getting the address wrong and the name wrong and the signature wrong, still he owed the duty not to be negligent himself, but to exercise the care of a man of ordinary prudence under all the circumstances. If he did that, you would answer this issue, 'No.' If the defendant has satisfied you from all this evidence, evidence of the plaintiff and the defendant all taken together, that he failed to act as an ordinarily prudent man would have acted under all the circumstances, you will answer it 'Yes.' It was his duty, if information came to him that was reasonably calculated to put him on inquiry as to whether or not the dead woman was his sister—it was his duty to exercise ordinary care to find out whether or not it was his sister; and if

he failed to exercise such ordinary care in making inquiry and in ascertaining and in attending her funeral, that is the reason he suffered, then he is guilty of contributory negligence, and you will answer this issue 'Yes.' Or if he knew from what was told him by Mr. Cates that it was his sister, and then he did not exercise ordinary care to supply himself with the necessary funds, and to make his arrangements to get off and go in time for the funeral, then he would be guilty of negligence, and if that negligence caused him to fail to get to the funeral, and brought about his suffering, then you should answer that issue 'Yes.' So, at last, the whole question upon this issue comes down to whether or not he exercised the care of an ordinarily prudent man under all the circumstances, taking into consideration what had been said to him and what he knew and what he did, the time of night, the fact that he had no money at the time, his character and standing in the community, as to whether or not he could have secured the necessary funds and could have gotten off, whether he should have concluded that she was his sister, whether he made inquiry about it and pursued the investigation and acted as a man of ordinary prudence would have acted under all the circumstances. If he did, your answer to this issue should be 'No,' that is, that he was not guilty of contributory negligence. But if the defendant has satisfied you that he failed to exercise the care of a man of ordinary prudence in the particulars I have mentioned, or any of them, then you will answer the issue 'Yes.' "

We do not agree with the defendant as to its fourth contention.

There is no evidence that the funeral of the sister could have been reasonably postponed, and if this fact appeared, we fail to see how the act of her husband, over whom the plaintiff had no control, in declining to do so, could affect his right to recover.

His Honor correctly held that the burden of the second issue was on the defendant.

The cases of *Hocutt v. Telegraph Co.*, 147 N. C., 186, and *Hauser v. Telegraph Co.*, 150 N. C., 557, relied on by the defendant, are not in conflict with this view.

No issue of contributory negligence was submitted in either case, and consequently the question here raised of the burden of proof on that issue could not be involved.

What is said by *Justice Walker* in the last case, as to the burden of proof, relates entirely to the question of proximate cause, as is clearly shown by the language he uses. He says: "The burden of proof was not upon the defendant to show that the plaintiff had not exercised diligence, but upon the plaintiff to show not only that the defendant had been guilty of negligence, but that its negligence was the proximate cause of the damage to him."

This appears to us a clear case of negligence on the part of the defendant, resulting in damage to the plaintiff, and it has been presented to the jury with a just recognition of the rights of both parties.

No error.